IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA,**

v.

**JAN LUIS RIVERA-PITRE**,

Defendant.

Criminal No. 23-209 (FAB/BJM)

## REPORT AND RECOMMENDATION

On May 11, 2023, United States Probation Officers ("USPOs") visited Jan Luis Rivera-Pitre ("Rivera-Pitre") at his apartment as part of their work overseeing his supervised release and discovered a firearm in his bedroom closet. Docket Nos. ("Dkts.") 17, 23. Rivera-Pitre was subsequently indicted for being a convicted felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Dkt. 1. He moved to suppress the firearm, Dkt. 17, the government opposed, Dkt. 23, and he responded. Dkt. 26. This matter was referred to me for a report and recommendation. Dkts. 18, 19. I held a suppression hearing on December 4, 2023. Dkts. 38, 61. Following that hearing, Rivera-Pitre submitted a post-hearing brief, Dkt. 55, and the government responded. Dkt. 58.

For the reasons that follow, I recommend the motion to suppress be **DENIED**.

### BACKGROUND

USPOs Linda Perez ("Perez") and Ruben Velez ("Velez") testified on behalf of the government. Dkt. 38. Rivera-Pitre presented no witnesses. With a few exceptions discussed below, the parties largely agree on how the events unfolded.

On the morning of May 11, 2023, USPOs Perez and Velez arrived at Rivera-Pitre's apartment and knocked on the door. Dkt. 61 at 16:10–22, 18:14–24. After no one answered, USPO Perez called Rivera-Pitre, who opened the door allowing the probation officers inside. Dkt. 17 at

2; Dkt. 61 at 19:2–20:12. Upon entering, USPO Perez asked Rivera-Pitre about his girlfriend, with whom she was apparently familiar. Dkt. 61 at 21:18–25. Rivera-Pitre stated the couple's relationship had ended, but that he was with a new partner. *Id.* USPO Perez then heard a noise coming from the bedroom, asked Rivera-Pitre if anyone else was in the apartment, and he replied that his new girlfriend, Coral Del Mar ("Del Mar"), was in a bedroom. Dkt. 17 at 2; Dkt. 61 at 22:1–11. During this conversation, the probation officers also noticed what appeared to be a firearm atop the refrigerator. Dkt. 17 at 2; Dkt. 61 at 24:12–24. However, Rivera-Pitre explained this item was a toy gun for Del Mar's child and the probation officers confirmed it was a BB gun. Dkt. 17 at 2; Dkt. 61 at 24:18–25:2.

USPO Perez then asked to meet Del Mar, and walk through the three-bedroom apartment. Dkt. 17 at 2; Dkt. 61 at 25:3–8. Upon entering the first two bedrooms, she instructed Rivera-Pitre to open closet doors and he complied. *Id.* at 25:15–26:4. USPO Perez and Rivera-Pitre then arrived at the latter's bedroom where they encountered Del Mar and her son sitting on an inflatable mattress. Dkt. 17 at 2; Dkt. 61 at 25:19–25. The government contends this was the first time USPO Perez saw the infant. Dkt. 23 at 15; Dkt. 61 at 27:1–6, 38:3–9. And though Rivera-Pitre initially disputed that claim, Dkt. 26 at 6, he now apparently concedes it. Dkt. 55 at 3.

Here, the stories diverge. According to the government, USPO Perez asked Rivera-Pitre to open his bedroom closet door and he did so voluntarily. Dkt. 23 at 3; Dkt. 61 at 27:10–17. USPO Perez then saw a firearm and firearm magazine in plain view while Rivera-Pitre scrambled to hide the firearm with a bag. Dkt. 23 at 3; Dkt. 61 at 27:10–17, 29:6–19. Rivera-Pitre disagrees on both counts. He denies opening the closet. Dkt. 17 at 2, 5; Dkt. 17-1 ¶ 9; Dkt. 26 at 1–2; Dkt. 55 at 2. And he claims once USPO Perez opened it, she moved a plastic bag on the shelf to uncover the previously obscured firearm. Dkt. 17 at 2.

Either way, the government and Rivera-Pitre agree that, once USPO Perez saw the firearm, she ordered everyone out of the bedroom and called police to arrest Rivera-Pitre. Dkt. 17 at 2–3; Dkt. 61 at 30:16–31:2.

## DISCUSSION

### I. Fourth Amendment Search

Rivera-Pitre classifies USPO Perez's actions here as a search. Dkt. 17 at 3–5. The government contends she merely conducted a home visit, not a search, and thus her actions did not implicate the Fourth Amendment. Dkt. 23 at 5–7. Rivera-Pitre has the better argument.

The Fourth Amendment states "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV. However, probationers and parolees have diminished Fourth Amendment protections. *United States v. Knights*, 534 U.S. 112, 119 (2001). "This observation applies with equal force to individuals, like [Defendant], subject to federal supervised release-the reformed successor to federal parole." *United States v. Reyes*, 283 F.3d 446, 458 (2d Cir. 2002). Nevertheless, "[a] probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). This reasonable suspicion standard is a lower bar than the probable cause normally required to search a citizen's residence. *Knights*, 534 U.S. at 121.

The government claims a Fourth Amendment search does not occur when officers conduct a cursory walkthrough of a probationer's home to look for weapons or contraband in plain sight. Dkt. 23 at 5–7. However, the government concedes the firearm at issue was found in a closet that was closed when USPO Perez entered Rivera-Pitre's bedroom. *Id.* at 3; Dkt. 61 at 41:11–18. And opening a closet door amounts to a search under the Fourth Amendment. *See United States v.*

*Gerry*, 845 F.2d 34, 35–36 (1st Cir. 1988) (noting officers looked in a closet, among other places, and authorizing this "protective sweep" under the exigency exception to the Fourth Amendment). Though the government argues Rivera-Pitre opened the closet door at USPO Perez's request, if true, that action would constitute Rivera-Pitre's consent to a *search*. *See United States v. Winston*, 444 F.3d 115, 122 (1st Cir. 2006) (Defendant consented to search of nightstand by gesturing toward it in response to officer's question about location of his identification); *United States v. Kelley*, 594 F.3d 1010, 1014 (8th Cir. 2010) (consent found where Defendant signed a consent to search house, led officers to shed on property where guns were located, and opened the shed door). Such consent would not render the firearm or magazine in plain view of officers who entered the bedroom while the closet door was closed. Accordingly, regardless of who opened the bedroom closet, USPO Perez conducted a search as defined by the Fourth Amendment when she looked inside.

## II.     Consent

Unsurprisingly, the government argues that, even if USPO Perez searched the closet, Rivera-Pitre consented to that search by opening the closet door. Dkt. 23 at 7–11. As mentioned, Rivera-Pitre denies opening the closet. Dkt. 17 at 2, 5; Dkt. 17-1 ¶ 9; Dkt. 26 at 1–2; Dkt. 55 at 2. However, USPO Perez credibly testified she asked Rivera-Pitre to open the closet door and he voluntarily did so. Dkt. 61 at 41:11–18. Because Rivera-Pitre offered no evidence rebutting this contention, I find he opened the closet door.

Rivera-Pitre argues that, even if he did open the closet door, he did not consent to a search because he acted at the will of USPO Perez. Dkt. 55 at 2. He observes that consent is invalid where an officer gives a defendant false assurances he must submit to a search. Dkt. 17 at 7 (citing *United States v. Vazquez*, 724 F.3d 15, 22 (1st Cir. 2013)). He asserts USPO Perez asked him to open the

closet door and that his probation conditions required him to follow her instructions. Dkt. 55 at 2 (citing Dkt. 39-1 at 5 ¶ 13). Accordingly, he argues he "had no choice but to open the closet, even if USPO Perez posed the instruction in the form of a question." *Id.* However, Rivera-Pitre's supervised release conditions also state he need only submit to a search of his house and property "based upon reasonable suspicion of contraband or evidence of a violation of a condition of release." Dkt. 39-1 at 6 ¶ 6. And there is no evidence USPO Perez told Rivera-Pitre he was required to open the closet door or otherwise misinformed him regarding his supervised release conditions. Accordingly, if Rivera-Pitre thought he was required to open the closet door in response to USPO Perez's question, that belief stemmed from his own misunderstanding of his supervised release conditions, not USPO Perez's actions. He thus opened the closet voluntarily.

Rivera-Pitre next argues his failure to open the closet door would have created reasonable suspicion allowing USPO Perez to open it anyway. Dkt. 55 at 2. Maybe so. But that does not preclude finding he consented to a search. *See Vazquez*, 724 F.3d at 22 (quoting in parenthetical *Robbins v. MacKenzie*, 364 F.2d 45, 49–50 (1st Cir. 1966) ("Bowing to events, even if one is not happy about them, is not the same thing as being coerced.") (finding valid consent given even though officers very likely had probable cause to search apartment due to opium smell). Accordingly, by opening the closet door, Rivera-Pitre thus consented to a search of the closet.

Lastly, I note Rivera-Pitre argues the firearm was obscured by a bag when the closet was first opened, Dkt. 17 at 2, and questions whether USPO Perez could see it on a shelf above her head. Dkt. 55 at 4–5. However, USPO Perez testified she immediately saw the firearm once Rivera-Pitre opened the closet. Dkt. 61 at 41:19–21. She explained she stood a few feet from the closet shelf and could see the firearm from there. *Id.* at 41:19–23; 42:25–43:11. A photo taken a short distance from the shelf and from a vantage point below it illustrates USPO Perez's testimony.

*See* Dkt. 39-1 at 8 (underside of shelf and firearm both visible). I thus find that, once Rivera-Pitre opened the closet door, USPO Perez saw the firearm in plain view. Accordingly, I recommend Rivera-Pitre's motion to suppress the firearm be **DENIED**.

I need not go further. However, in the interest of efficiency, I address the parties' remaining arguments.

### III.    Reasonable Suspicion

The government argues USPO Perez had reasonable suspicion to open the closet door even absent Rivera-Pitre's consent. Rivera-Pitre agrees that, if he refused USPO Perez's request to open the closet, she would have had reasonable suspicion to open it. Dkt. 55 at 2. However, because Rivera-Pitre apparently contends USPO Perez opened the closet without first seeking his consent, I address whether she would have had reasonable suspicion to do so.

As discussed, officers need only reasonable suspicion, not probable cause, to search a probationer's home. *Griffin*, 483 U.S. at 873. And "parolees enjoy even less of the average citizen's absolute liberty than do probationers." *United States v. Cardona*, 903 F.2d 60, 63 (1st Cir. 1990). Here, Rivera-Pitre was on supervised release. *See Johnson v. United States*, 529 U.S. 694, 696–97 (2000) ("[T]he Sentencing Reform Act of 1984 . . . eliminated most forms of parole in favor of supervised release."). "Persons serving a term of supervised release are, for purposes of the analysis at hand, not unlike probationers." *United States v. Borges-Sanchez*, 2023 WL 2950579, at *4 (D.P.R. Apr. 14, 2023) (addressing whether reasonable suspicion justified search of supervised releasees' shared residence and vehicles). Accordingly, I examine whether USPOs Perez had reasonable suspicion to search Rivera-Pitre's closet.

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but

> also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White*, 496 U.S. 325, 330 (1990). Courts must inquire whether reasonable suspicion arose by examining the "'totality of the circumstances' of each case to see whether the officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (citing *Cortez*, 449 U.S. at 418). But even in this context, "the burden is on the Government to prove that the probation officers had reasonable suspicion prior to executing the warrantless search of Defendant's residence." *United States v. Wormsley*, 2016 WL 10672078, *6 (W.D. Pa. Aug. 17, 2016), *aff'd*, 708 F. App'x 72 (3d Cir. 2017).

The government argues USPO Perez could search Rivera-Pitre's closet based on a reasonable suspicion he was violating a condition of supervision, "if not a firearms- or narcotics-related law." Dkt. 23 at 13. It cites the presence of Del Mar and her three-year-old son combined with officers' knowledge that Rivera-Pitre was a convicted fentanyl trafficker, lived in a high-crime neighborhood, was charged in a murder, had installed surveillance cameras outside his apartment, and did not immediately open the front door when officers arrived. Dkt. 23 at 13–15.

Rivera-Pitre argues USPO Perez stated she only looked inside the closet because she suspected unknown persons in the apartment and that circumstances did not warrant that belief. Dkt. 55 at 2–3. However, "an officer's state of mind or subjective intent in conducting a search is inapposite as long as the circumstances, viewed objectively, justify the action taken." *United States v. Sanchez*, 612 F.3d 1, 6 (1st Cir. 2010) (quoting in parenthetical *United States v. Hadfield*, 918 F.2d 987, 993 (1st Cir. 1990)). Thus, courts "have been unwilling to entertain Fourth Amendment

challenges based on the actual motivations of individual officers." *Whren v. United States*, 517 U.S. 806, 813 (1996). Nevertheless, Rivera-Pitre further argues the facts did not give rise to reasonable suspicion. Dkt. 55 at 4. Accordingly, I examine that argument.

Suspected probation violations create reasonable grounds to search a residence. *United States v. Giannetta*, 909 F.2d 571, 576 (1st Cir. 1990). The *Giannetta* court observed that, based on information from police and his own surveillance, the defendant's probation officer suspected he had violated his probation by travelling outside the jurisdiction, making false statements on a loan application, contacting a convicted felon, carrying a firearm, and driving with a suspended license. *Id.* at 573. Further, the officer believed the defendant personally tried to bribe him for permission to travel outside the jurisdiction. *Id.* at 573–74.

Here, I first note the government argues Del Mar and her son's presence, along with the former's failure to identify herself to officers, created a reasonable suspicion that Rivera-Pitre violated supervised release conditions barring him from (1) interacting with people he knows are engaged in criminal activity and (2) changing living arrangements without notifying his probation officer. Dkt. 23 at 14–15. The government fails to explain how Rivera-Pitre's contact with Del Mar and her three-year-old son created a suspicion he was interacting with known criminals. For example, it does not indicate or even imply that Del Mar was known to authorities. However, the presence of Del Mar and her son in Rivera-Pitre's bedroom and Rivera-Pitre's statement that Del Mar was his girlfriend gave rise to a reasonable suspicion that Del Mar and her son lived in the apartment. Though Rivera-Pitre argues no condition of his supervised release prohibited him from receiving daytime visitors, USPO Perez stated she visited the apartment in the morning. Dkt. 61 at 16:21–22. She could thus reasonably suspect that Del Mar and her son had spent the night.

Accordingly, USPO Perez had reasonable suspicion to search the bedroom closet for evidence Del Mar lived in Rivera-Pitre's apartment.

Moreover, the government identified facts creating reasonable suspicion that Rivera-Pitre violated his supervised release conditions by engaging in criminal activity. First, both USPO Perez and Velez stated the Candelaria public housing project is a high-crime area, specifically known for drug and firearm offenses. Dkt. 61 at 14:5–15; 56:17–57:11; *see United States v. Belin*, 868 F.3d 43, 51 (1st Cir. 2017) (though insufficient to support reasonable suspicion on its own, area's reputation for types of crime may support reasonable suspicion of those crimes). Further, Rivera-Pitre was on supervised release in connection with a fentanyl trafficking conviction and was charged with two murders in state cases. Dkt. 23 at 3; Dkt. 61 at 8:6–9:5; *see United States v. Am*, 564 F.3d 25, 32 (1st Cir. 2009) (criminal history and recent arrest relevant to reasonable suspicion analysis). While those charges were ultimately dropped, they were nevertheless pending at the time of the search. Dkt. 61 at 34:19–24. Thus, though these facts alone do not create reasonable suspicion, they properly inform the analysis.

I next note that both USPOs Perez and Velez observed that Rivera-Pitre had installed security cameras. *Id*. at 17:9–18:2, 58:4–59:5. USPO Velez stated he had never seen such cameras installed in public housing projects such as the one where Rivera-Pitre lived. *Id.* at 59:6–10. And though Rivera-Pitre told USPO Perez he saw her approaching his apartment using his cameras, *id.* at 21:7–13, he did not come to the door when she knocked. *Id.* at 17:16–19:3. Both USPOs testified these cameras were not present during their previous visit to Rivera-Pitre's apartment one month prior. *Id.* at 36:2–3, 58:4–59:5. Though Rivera-Pitre contends otherwise, Dkt. 55 at 4, he offered no evidence supporting his assertion. Given Rivera-Pitre's alleged involvement in two murders, his new and apparently rare security measures coupled with his delay in answering the door could

reasonably fuel both officers' suspicion that he was involved in criminal activity in violation of his supervised release conditions.

I note that Rivera-Pitre contends he installed the cameras because his daughter often visited his apartment. Dkt. 55 at 4. However, a defendant's conduct may create reasonable suspicion even where a more innocent explanation is possible. *See Am,* 564 F.3d at 30 ("[E]ven innocuous facts, which when taken alone may not be 'sufficient to create reasonable suspicion[,] . . . may in combination with other innocuous facts take on added significance.'") (alterations in original) (quoting *United States v. Ruidiaz*, 529 F.3d 25, 30 (1st Cir. 2008)). Accordingly, that argument does not preclude finding reasonable suspicion.

In sum, Del Mar and her son's presence in Rivera-Pitre's bedroom on the morning of May 11, 2023 created reasonable suspicion that Rivera-Pitre had violated his supervised release conditions by changing his living situation without notifying USPO Perez. Further, though insufficient on their own to create reasonable suspicion, the prevalence of drug and firearm crimes in the Candelaria public housing project, along with Rivera-Pitre's drug trafficking conviction and pending murder charge, properly informed the reasonable suspicion analysis. And Rivera-Pitre's recently installed security cameras, combined with his admission he saw the USPOs approach using the cameras and his failure to open the door when they knocked, gave USPOs Perez and Velez reasonable suspicion to search Rivera-Pitre's apartment for evidence he violated the terms of his supervised release by engaging in criminal activity. Accordingly, even if USPO Perez did not seek Rivera-Pitre's permission to open the closet door, she had reasonable suspicion to open it. This amounts to an additional reason to deny Rivera-Pitre's motion to suppress.

### IV.       Protective Sweep

The government also argues that, absent Rivera-Pitre's consent to search the closet, USPO Perez lawfully opened it while conducting a protective sweep. Dkt. 23 at 7–11. I disagree. Generally, officers may perform a "limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 337 (1990). However, an arrest is not required to perform a protective sweep. *Drohan v. Vaughn*, 176 F.3d 17, 22 (1st Cir. 1999). Where, as here, "police were lawfully present in a home by consent," they may perform a protective sweep if they have reasonable suspicion to do so. *United States v. Martins*, 413 F.3d 139, 149–50 (1st Cir. 2005), *abrogated on other grounds recognized by Hill v. Walsh*, 884 F.3d 16, 23 (1st Cir. 2018) (citing *United States v. Garcia*, 997 F.2d 1273, 1282 (9th Cir. 1993)).

The government argues USPO Perez legally performed a protective sweep because she learned a second individual, Del Mar, was present and Del Mar did not initially identify herself to the probation officers. Dkt. 23 at 9–10. According to the government, probation officers asked Rivera-Pitre if anyone was in the residence shortly after they entered and Rivera-Pitre responded that his partner, Del Mar, was there. Dkt. 23 at 2. The government contends USPO Perez subsequently asked to meet Del Mar and Rivera-Pitre accompanied her to his bedroom where she encountered Del Mar and her son. *Id.* at 2–3. USPO Perez then either asked Rivera-Pitre to open the bedroom closet door or opened it herself. *Id.* The government again notes USPO Perez could consider Rivera-Pitre's drug trafficking conviction and pending murder charge when making this decision. *Id.* at 10.

However, these facts did not warrant a protective sweep. The presence of a second individual in a residence does not automatically create suspicion that a third individual is also present. *See United States v. Serrano-Acevedo*, 892 F.3d 454, 459 (1st Cir. 2018) ("The government does not provide any facts supporting its theory that a third person remained in the house after [Defendant] and his wife came out."). Similarly, the presence of a third person in a residence, Del Mar's son in this case, does not mean a fourth person is there. Further the government's unstated assumption that other dangerous individuals involved in Rivera-Pitre's past or alleged crimes were in his apartment is "based on unfounded speculation not 'articulable facts' in the record." *Id.* at 460 (quoting *United States v. Delgado-Perez*, 867 F.3d 244, 251 (1st Cir. 2017)). Accordingly, neither Del Mar and her son's presence nor Rivera-Pitre's past and alleged crimes gave rise to the inference that another person remained hidden in the residence.

The government cites three cases supporting its assertion that officers conducted a valid protective sweep due to exigent circumstances. Dkt. 23 at 10 (citing *United States v. Oguns*, 921 F.2d 442, 446 (2d Cir. 1990); *Wormsley*, 2016 WL 10672078; *United States v. Burnette*, 2001 WL 1297781, at *4 (D.N.H. Oct. 10, 2001)). Unlike *Serrano-Acevedo*, *Delgado-Perez*, and *Buie*, none of the government's cases are binding authority. And even if they were, all are distinguishable from the facts here.

*Oguns* held that, after arresting a suspect outside a residence, officers could lawfully sweep the residence where they had "(1) a reasonable belief that third persons [were] inside, and (2) a reasonable belief that the third persons [were] aware of the arrest outside." 921 F.2d at 446 (alterations in original) (citations omitted). The *Oguns* court found officers reasonably held both beliefs because the front door of the defendant's apartment remained opened after his arrest. *Id.* at

446–47. However, *Oguns* is irrelevant here because the closet door was originally *closed*. Moreover, it was opened before Rivera-Pitre's arrest.

*Wormsley* is also distinguishable. The *Wormsley* court found that, before searching the second floor of a residence, officers "reasonably believed that there were at least two individuals upstairs as they had heard them moving quickly about that level of the home while they were waiting [outside] for 2 or 3 minutes." 2016 WL 10672078, at *8. By contrast, the government here does not allege USPO Perez heard noises leading her to believe anyone was in the closet before it was opened.

As for *Burnette*, the court there found an agent had reasonable suspicion warranting a protective sweep of a house after the defendant refused to confirm or deny whether others were present. 2001 WL 1297781, at *5. But here, Rivera-Pitre told officers Del Mar was present and accompanied them to meet her. And there is no evidence USPO Perez asked Rivera-Pitre whether anyone was in the closet, much less that he refused to answer that question. Thus, *Burnette* is inapposite. Accordingly, I recommend finding no exigent circumstances warranted a protective sweep.

## V.    Good Faith Exception

Finally, the government argues suppression is unwarranted absent a finding the probation officers acted in bad faith. Dkt. 23 at 15–16 (citing *Davis v. United States*, 564 U.S. 229, 236–237 (2011); *Herring v. United States*, 555 U.S. 135, 144 (2009)). And it contends USPOs Perez and Velez acted in good faith given the location, Rivera-Pitre's risk profile, and the facts officers identified. *Id.* The government offers no further analysis. *Davis* held police could reasonably rely on subsequently overturned legal precedent. 564 U.S. at 232. And *Herring* held police acted in good faith where they unknowingly relied on an erroneous database. 555 U.S. at 137. Neither issue

is relevant here. However, as discussed, USPO Perez lawfully either asked Rivera-Pitre to open the closet door or opened it herself.

## CONCLUSION

For the foregoing reasons, I recommend Rivera-Pitre's motion to suppress any evidence seized from him on May 11, 2023 be **DENIED**.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 18th day of January, 2024.

*s/ Bruce J. McGiverin*
Bruce J. McGiverin
United States Magistrate Judge